**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**

| | |
|---|---|
| **RUBEN PORRAS and Ashley PORRAS,** individually and as next friends of their minor children**, D.P., A.P., K.P., and E.R.** )<br><br>**PLAINTIFFS,** )<br><br>**v.** )<br><br>**BALFOUR BEATTY COMMUNITIES, LLC,** a Delaware Limited Liability Company; **BALFOUR BEATTY/BENHAM MILITARY COMMUNITIES, LLC,** a Delaware Limited Liability Company; **BALFOUR BEATTY MILITARY HOUSING MANAGEMENT, LLC,** a Delaware Limited Liability Company**; BALFOUR BEATTY MILITARY HOUSING INVESTMENTS, LLC,** a Delaware Limited Liability Company; **BALFOUR BEATTY MILITARY HOUSING DEVELOPMENT, LLC**, a Delaware Limited Liability Company; and **FORT EISENHOWER HOUSING LLC**, a Delaware Limited Liability Company; | Civil Action No. _____<br><br>**(JURY TRIAL DEMANDED)**<br><br>**COMPLAINT FOR DAMAGES** |

**DEFENDANTS.**

## INTRODUCTION

1.    This case is the second case filed in this Court related to the systematic abuse of military members and their families at Fort Eisenhower, Georgia. The Defendants in this case (collectively referred to herein as "Balfour") through the Military Housing Privatization Initiative ("MHPI") have realized millions, if not billions, of dollars of profit all while systematically ignoring service requests, falsifying maintenance records, and causing military members and their families at Fort Eisenhower, Georgia to be exposed to poisonous mold infestations and other hazardous environmental conditions, causing them substantial physical harm and mental anguish.

1

Balfour has cheated military members and their families by forcing them to live in housing which poses an imminent threat to their health and safety, while taking the military members' compensation in the form of their Basic Allowance for Housing ("BAH"), an entitlement military members receive to offset the cost of housing at the duty station to which the military members are ordered. Despite Congressional inquiries, a federal felony conviction for major fraud against the United States, inspector general investigations, and numerous complaints by military members who rent houses from Balfour, Balfour has persisted in its deplorable conduct. The major fraud against the United States to which Balfour pled guilty in December 2021 was but one part of the fraud by which Balfour has deceived and continues to defraud Plaintiffs and other like and similarly situated service members who live in their properties. Plaintiffs bring this action to hold Balfour civilly accountable for the torts and other actionable wrongs by which Balfour has caused personal injury and economic loss to Plaintiffs and others at Fort Eisenhower. This action, and actions filed by other military members, send a message to Balfour that our military members will no longer be silent, while Balfour defrauds military members and the United States by ill-gotten profiteering off citizens who have sworn to protect their country with their lives.

## **JURISDICTION**

2.     This Court has jurisdiction over this action under 28 U.S.C. § 1332(a) because there is complete diversity citizenship among the parties and the amount in controversy exceeds $75,000.00, exclusive of attorney's fees and court costs.

3.     This Court also has jurisdiction over this action under 28 U.S.C. § 1331 because: (1) some or all of the acts or omissions complained of herein occurred at Fort Eisenhower, Georgia which is, in part, a federal enclave; and (2) some or all of the acts or omissions complained of

herein violate the laws of the United States.[1] This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 because Plaintiffs' state law claims are so related to the claims in the action within this Court's original jurisdiction that they form part of the same case or controversy.

### PARTIES

4.      Plaintiffs ("Porras Family" or "Plaintiffs"), described more fully below, are an active-duty soldier in the United States Army and his family, who lived in housing on Fort Eisenhower, Augusta, Georgia managed by Balfour or their related entities.

5.      The Porras Family are currently assigned to Fort Eisenhower, Georgia and live in off-base housing. The Porras Family is a close-knit family that enjoys spending time together and with friends; going to the park; and family night board games.

6.      Ruben Porras ("SFC Porras") is a Sergeant First Class in the United States Army. He has been in the Army for thirteen years, has four combat deployments, and successfully completed a three-year assignment as a Drill Sergeant.

7.      Ashley Porras ("Mrs. Porras") is SFC Porras's wife.

8.      Mrs. Porras and SFC Porras have been married for 10 years.

9.      In addition to her role as caretaker for hers and SFC Porras's four young children, Ms. Porras worked, during the time frame of the events in this Complaint, at a chiropractic office. She currently is employed at a preschool.

10.      E.R. is Ms. Porras's twelve-year-old son and SFC Porras's stepson. He enjoys reading, playing chess, and playing video games.

---

[1] Except where noted otherwise, Georgia law applies to Plaintiffs' claims. *See* 28 U.S.C. § 5001(b) ("In a civil action brought to recover on account of an injury sustained in [a place subject to the exclusive jurisdiction of the United States within a State], the rights of the parties shall be governed by the law of the State in which the place is located.").

11.    K.P. is the Porras Family's eight-year-old son. He excels in gymnastics, enjoys seasonal sports, and enjoys playing video games.

12.    A.P. is the Porras Family's six-year-old daughter. She also enjoys gymnastics, soccer, and cheerleading.

13.    D.P. is the Porras Family's four-year-old son. He loves flag football and gymnastics.

14.    Defendants are a group of related entities responsible for construction, management, and maintenance of on-base military housing.

15.    Defendant Balfour Beatty Communities, LLC ("BBC") is a Delaware limited liability company authorized to do business in Georgia and with a principal office address located at One Country View Road, Suite 100, Malvern, PA 19355. Upon information and belief, BBC is a subsidiary, either directly or through other wholly owned entities, of Balfour Beatty, PLC, a United Kingdom-based international infrastructure company.

16.    Defendant Balfour Beatty/Benham Military Communities, LLC ("Balfour Beatty/Benham Military Communities") is a Delaware limited liability company authorized to do business in Georgia and with a principal office address located at One Country View Road, Suite 100, Malvern, PA 19355. Upon information and belief, Balfour Beatty/Benham Military Communities, LLC is a subsidiary, either directly or through other wholly owned entities, of Balfour Beatty, PLC, a United Kingdom-based international infrastructure company.

17.    Defendant Balfour Beatty Military Housing Management, LLC ("Balfour Beatty Military Housing Management") is a Delaware limited liability company authorized to do business in Georgia and with a principal office address located at One Country View Road, Suite 100, Malvern, PA 19355. Upon information and belief, Balfour Beatty Military Housing Management,

LLC is a subsidiary, either directly or through other wholly owned entities, of Balfour Beatty, PLC, a United Kingdom-based international infrastructure company.

18.     Defendant Balfour Beatty Military Housing Investments, LLC ("Balfour Beatty Military Housing Investments") is a Delaware limited liability company authorized to do business in Georgia and with a principal office address located at One Country View Road, Suite 100, Malvern, PA 19355. Upon information and belief, Balfour Beatty Military Housing Investments, LLC is a subsidiary, either directly or through other wholly owned entities, of Balfour Beatty, PLC, a United Kingdom-based international infrastructure company.

19.     Defendant Balfour Beatty Military Housing Development, LLC ("Balfour Beatty Military Housing Development") is a Delaware limited liability company authorized to do business in Georgia and with a principal office address located at One Country View Road, Suite 100, Malvern, PA 19355. Upon information and belief, Balfour Beatty Military Housing Development, LLC is a subsidiary, either directly or through other wholly owned entities, of Balfour Beatty, PLC, a United Kingdom-based international infrastructure company.

20.     Defendant Fort Eisenhower Housing, LLC ("Fort Eisenhower Housing") is a Delaware limited liability company authorized to do business in Georgia and with a principal office address located at One Country View Road, Suite 100, Malvern, PA 19355. Upon information and belief, Fort Eisenhower Housing is a subsidiary, either directly or through other wholly owned entities, of Balfour Beatty, PLC, a United Kingdom-based international infrastructure company.

## BACKGROUND

**A.      Privatized Housing on Fort Eisenhower**

21.     Pursuant to the National Defense Authorization Act for Fiscal Year 1997, the Department of Defense authorized the development of the MHPI intending to improve military

housing and develop new military housing projects through outsourcing to MHPI contractors.

22.     Under an MHPI arrangement, a private contractor, such as Balfour, is granted a multi-decade master real property lease ("Master Lease") of on-base ground and appurtenances, including existing and planned military housing, for which the private contractor agrees to manage, develop, and sublease facilities to military members and their families for use as on-base housing, with the MHPI contractor serving as the landlord under a sublease.

23.     In return for the MHPI contractor managing and/or developing the housing facilities, the federal government provides certain payments, incentivized financing, and – perhaps most importantly – the ability to receive payment of military members' BAH as rent under the sublease between the MHPI contractor and the military member.

24.     The most common arrangement to facilitate payment of the military member's BAH to the MHPI contractor involves the federal government deducting the BAH amount as an allotment from a military member's regular military compensation and paying it over to the MHPI contractor.

25.     BAH amounts are set annually by Congress through defense appropriations bills, and as BAH increases or decreases, based on changes in cost of living, it has the effect of increasing or decreasing the amount of rent a military member pays to an MHPI contractor.

26.     Additionally, BAH rates are based on (a) the geographic location where the military member is stationed; (b) the military member's pay grade; and (c) whether the military member has dependents.

27.     Defendants, either directly or through subsidiary or affiliated Defendants, participate in the MHPI as the MHPI contractor responsible for military housing at Fort Eisenhower and at other military installations throughout the United States.

**B.      The Fort Eisenhower MHPI and Balfour**

28.      In April 2006, the Department of the Army signed a fifty-year (50) Master Lease with Defendant Fort Eisenhower Housing.[2]

29.      In the Master Lease, Fort Eisenhower Housing agreed to operate the base housing at Fort Eisenhower "in a decent, safe, and sanitary condition by and at the sole expense" of Fort Eisenhower Housing.

30.      Fort Eisenhower Housing agreed to "comply with all applicable Federal, state, county, and municipal laws, ordinances and regulations" in the performance of the Master Lease.

31.      At the time the Department of the Army and Fort Eisenhower Housing executed the Master Lease, a company known as GMH Military Housing Investments, LLC ("GMH") was the managing member of Fort Eisenhower Housing.

32.      Balfour Beatty, PLC ("Balfour Beatty"), a United Kingdom-based multinational construction and infrastructure company, was one of the main suppliers of new housing stock to GMH's military housing division through one of its subsidiaries.

33.      In the Spring of 2008, Balfour Beatty, through BBC, acquired all of GMH's military housing assets – including Fort Eisenhower Housing – in a $350 million transaction.

34.      Upon information and belief, BBC, either directly or through its subsidiaries or affiliates – Balfour Military Housing Management; Balfour Beatty Military Housing Investments; Balfour Beatty Military Housing Development; Balfour Beatty/Benham Military Communities;

---

[2] At the time of this transaction Fort Eisenhower Housing was known as Fort Gordon Housing, LLC. It changed its name to Fort Eisenhower Housing, LLC effective October 25, 2023, after Fort Gordon was renamed Fort Eisenhower on October 27, 2023, in accordance with a recommendation from the Naming Commission established under the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021. Throughout this Complaint, the current name of the installation, Fort Eisenhower, will be used.

and Fort Eisenhower Housing (collectively the "Balfour Affiliates") – assumed all obligations, as the MHPI contractor, for on-base housing at Fort Eisenhower.

35.    As the MHPI contractor, BBC and/or the Balfour Affiliates were obligated to:

a.    Comply with all applicable federal, state, county and municipal laws, ordinances, and regulations;

b.    Maintain the housing on Fort Eisenhower in good order and repair and in a decent, safe, and sanitary condition;

c.    Operate onsite offices for management and maintenance capable of administering preventative maintenance and responding to work orders;

d.    Oversee the maintenance and repair of the housing on Fort Eisenhower; and

e.    Maintain the housing on Fort Eisenhower in a manner that prevents its deterioration and keeps it free of defects that would affect the safety, appearance, or habitability of the housing.

36.    Through Fort Eisenhower Housing, BBC and/or the Balfour Affiliates, at any given time, sublease approximately 1,000 housing units to Soldiers stationed at Fort Eisenhower.

37.    The subleases, also sometimes titled "Resident Responsibility Agreements," ("Subleases") were signed between Fort Eisenhower Housing and the military members leasing Balfour houses.

38.    Balfour receives multimillions of dollars of revenue per month from the federal government as a result of the Master Lease and Subleases.

39.    As with other MHPI contractors, Balfour has also been eligible for certain funding and incentive payments directly from the federal government based on certain performance metrics.

40.     As discussed elsewhere in this Complaint, the major fraud against the United States, to which Balfour pled guilty on December 22, 2021, involved Balfour and Balfour's employees stealing, by fraud, money delivered to Balfour by the federal government as incentive payments based on certain performance metrics.

41.     On-base military housing at Fort Eisenhower and many other installations is typically subdivided based on the military members' rank, with some neighborhoods being eligible only for senior officers, some for officers and senior enlisted military members, and some for all ranks.

42.     Generally speaking, regardless of what housing unit a military member receives, the military member forfeits the entirety of their BAH for the on-base military housing.

43.     The demand for on-base housing at Fort Eisenhower generally exceeds the number of available on-base housing units, for a variety of reasons, including (a) scarcity of available rental homes in the Augusta area, (b) the relatively short duration of Soldiers' assignments to Fort Eisenhower, (c) requirements for expensive security deposits in off-base housing.

44.     Regardless of the quality of the housing it provides, Balfour gains lucrative financial benefits and an essentially unending stream of captive income from Subleases of on-base housing units to military members based at Fort Eisenhower.

45.     Despite the fact that the housing units subleased by Balfour have injured military members, including the Plaintiffs, the amount of revenue paid to Balfour has not diminished.

**C.     Balfour's Prior Mismanagement and Misconduct**

46.     As the sole MHPI contractor at Fort Eisenhower, Balfour has been and is unburdened by free market competition for military members in need of on-base housing.

47.     As the sole MHPI contractor at Fort Eisenhower, Balfour has had, and continues to have, monopolistic control of a market consisting of a captive stream of revenue from military members.

48.     As is often the unfortunate case, where a market actor obtains monopolistic control of a market, they are not constrained by competitive market forces to hold them accountable and are able to control the market to maximize their profit at the expense of the consumer. Balfour has proved to be no exception.

49.     By intentionally, systematically, and fraudulently refusing to maintain, repair, and keep-up the real property leased by Balfour, Balfour sought to increase its profits at the expense of military members and their families residing in on-base housing.

50.     Further, by falsifying maintenance records, Balfour was able to receive incentive payments from the federal government to which it would not have been entitled had the federal government known the truth about Balfour's failings.

51.     Specifically, not long after BBC acquired Fort Gordon Housing, and by virtue of that acquisition the Master Lease rights and Master Lease obligations, reports began to surface in the media in Augusta, Georgia regarding concerns of military members at Fort Eisenhower relating to mold in on-base housing and general maintenance failings by Balfour.

52.     One news report from May 2011 describes a home with "paint peeling off the walls and water stains dripping from the breaker box" and air conditioner ducts with "years of painted on mold, dust, [and] debris."[3]

---

[3] Katie Beasley, <u>Special Assignment: Mold at Fort Gordon? Part 2</u>, WRDW News 12, May 25, 2011 (available at: <u>https://www.wrdw.com/content/news/Special_Assignment_Mold_at_Fort_Gordon_Part_two_122626054.html</u>).

53.     In 2015, a Department of Defense Inspector General inspection of just eleven on-base housing units at Fort Eisenhower found nine electrical system safety deficiencies and six fire safety deficiencies.[4]

54.     Another news report from the Augusta, Georgia media in 2019 found there were still maintenance and mold problems, with a former Balfour employee being quoted as saying she would not "move on Fort [Eisenhower]."[5]

55.     The 2019 article also cites findings that, at the time of its publication, the base commander was aware of "122 electrical issues, 130 pest problems, 73 mold moisture complaints, and seven gas issues" in on-base housing at Fort Eisenhower.[6]

56.     A 2019 study on military family housing by the Military Family Advisory Network, a non-profit organization dedicated to supporting the needs of military members and their families, found that, of the Fort Eisenhower residents surveyed, 58% reported maintenance, repairs, or remediation issues; 28% reported mold issues; 23% reported concerns with the structural integrity of the home; 20% filth in the homes; and 20% reported plumbing issues and leaks.[7]

---

[4] Inspector General, U.S. Dep't of Defense, Report No. DODIG-2015-181, Continental United States Military Housing Inspections – Southeast, September 24, 2015, pgs. 29, 32  (available at: https://media.defense.gov/2015/Sep/24/2001714171/-1/-1/1/DODIG-2015-181.pdf).

[5] Meredith Anderson, I-TEAM: U.S. Army Kept in the Dark About Issues at Many Private Military Housing Complexes, Employee Says. WRDW News 12, September 18, 2019 (available at https://www.wrdw.com/content/news/I-TEAM-Employee-US-Army-kept-in-the-dark-about-issues-at-many-private-military-housing-complexes-560697521.html).

[6] Id.

[7] Military Family Advisory Network, Final Research Report: Living Conditions of Families in Privatized Military Housing, May 2019, pg. 108 (available at: https://militaryfamilyadvisorynetwork.org/wp-content/uploads/FINAL-report-5.20-_FOR-RELEASE.pdf).

57.     In 2019, the Senate and House Armed Services Committees held hearings and staff meetings with MHPI contractors and military families, as a result of ongoing concerns about health and safety concerns in military residences across the United States.

58.     As part of those hearings, Richard Taylor, President for Facility Operations, Renovations, and Construction at BBC testified under oath on December 5, 2019, before the House Armed Services Committee's Subcommittee on Readiness.[8]

59.     During that hearing, and under oath, Balfour, through Taylor's testimony, claimed that Balfour (1) had made "extensive changes" to Balfour's work order process to verify incentive fee submissions; (2) had increased staffing; (3) had added quality control and environmental health specialists; (4) had retained contractors for specialty services like HVAC maintenance and mold remediation; and (5) had strengthened Balfour's oversight of the management and handling of potentially hazardous material.

60.     Further, during the December 5, 2019 hearing, Mr. Taylor stated that Balfour owed an "obligation…to soldiers and their families" who live in on-base housing to provide "outstanding customer service" and "high standards of maintenance."[9]

61.     At the time of the December 5, 2019 hearing, Balfour had already received a subpoena from the United States Department of Justice related to fraudulent documentation Balfour had submitted to obtain performance incentive payments.

---

[8] Privatized Housing: Are Conditions Improving for Our Military Families?, 116th Congress, H.A.S.C. No. 116-51, December 5, 2019 (prepared statement of Richard Taylor, President, Facility Operations, Renovations, and Construction, Balfour Beatty Communities to the Subcommittee on Readiness of the House Armed Services Committee, available at: https://www.govinfo.gov/content/pkg/CHRG-116hhrg41473/pdf/CHRG-116hhrg41473.pdf).

[9] Id.

62.     As would later become apparent, Balfour had not contented itself with boosting revenues by limiting its downside through neglect of the subleased base housing units.

63.     Rather, Balfour engaged in a calculated scheme to maximize its upside revenue by falsely manipulating Balfour's maintenance reports to inflate Balfour's performance metrics in order to receive "incentive payments" as an MHPI contractor.

64.     As a prerequisite to obtain its incentive payments, Balfour was required to submit to the Department of the Army proof that Balfour had satisfied performance objectives related to, among other things, repair and maintenance of housing units subleased by Balfour to military members.

65.     These performance objectives were based, in significant part, on proof of tenant satisfaction scores and maintenance response closeout metrics.

66.     The United States Department of Justice's investigation uncovered Balfour's fraud ("DOJ Investigation") and revealed that Balfour managers in charge of on-base housing at military bases in Texas, Oklahoma, Washington, and California had manipulated and falsified records in BBC's computer system, Yardi, that was used by Balfour to record maintenance requests and responses. [10]

67.     The falsified records uncovered in the DOJ Investigation included records and reports that Balfour had submitted to obtain performance incentive payments.

68.     While Balfour was under the DOJ Investigation, Balfour continued to input false work order data into its Yardi system for Fort Eisenhower and fraudulently receive incentive fees for performance of work that Balfour knew that Balfour did not perform.

---

[10] Doc. 1, United States v. Balfour Beatty Communities, LLC 1:21-cr-00742-EGS, (D.D.C. December 21, 2021) (available at: https://www.justice.gov/opa/press-release/file/1458506/dl).

69. In December 2021, two Balfour manager-employees personally pled guilty to two federal felonies, wire fraud and conspiracy to commit wire fraud.

70. On December 22, 2021, Balfour, through BBC, pled guilty to single count criminal information of major fraud against the United States and was subsequently sentenced to pay $33,500,000 to the United States in criminal fines and an additional $31,800,000 in restitution ("Plea Agreement").[11]

71. Also on December 22, 2021, BBC settled a False Claims Act civil suit by the United States to resolve civil liability in the amount of $35,200,000.

72. In a clever bit of lawyering on the part of BBC's attorneys, Balfour received credit for amounts it would pay under the civil settlement against the amounts owed under its criminal plea – essentially defanging the penalties it received and allowing BBC to retain its ill-gotten profits.

73. As of yet, no senior executives from BBC have been personally punished.

74. Despite the fact that BBC, as a corporate entity, now has a felony conviction for defrauding the federal government, an investigation by the United States Senate Permanent Subcommittee on Investigations released on April 26, 2022 ("2022 Senate Report")[12] uncovered numerous incidents throughout 2020 and 2021 where soldiers and their families reported mold in housing subleased by Balfour at Fort Eisenhower that were never recorded in Yardi, as well as major defects, such as wet and squishy bathroom walls or a hole in the bedroom ceiling of a house.

---

[11] Doc. 5, United States v. Balfour Beatty Communities, LLC 1:21-cr-00742-EGS, (D.D.C. December 21, 2021) (available at: https://www.justice.gov/opa/file/1303736/dl).

[12] Staff of the Senate Permanent Subcommittee on Investigations, 117th Congress, Mistreatment of Military Families in Privatized Housing (Comm. Print 2022) (available at: https://www.hsgac.senate.gov/wp-content/uploads/imo/media/doc/2022-04-26%20PSI%20Staff%20Report%20-%20Mistreatment%20of%20Military%20Families%20in%20Privatized%20Housing.pdf).

75.     Balfour falsely recorded these maintenance issues as "routine" or "preventative maintenance."

76.     The incidents, more particularly described in Paragraphs 74 and 75are the type of false statements the DOJ Investigation uncovered repeatedly occurring between 2013 through 2019 and to which BBC pled guilty on December 22, 2021.

**D.     Poisonous Indoor Mold at Fort Eisenhower On-Base Housing**

77.     Poisonous mycotoxin-producing molds, found naturally in outdoor environments, are generally not harmful to human health or safety, except in extraordinary circumstances.

78.     Poisonous mycotoxin-producing mold found in damp indoor spaces poses a distinct, potentially deadly, threat to susceptible humans.

79.     Well-maintained indoor environments are generally not sufficiently damp to support colonization of poisonous mycotoxin-producing molds that are likely to cause serious disease or death in humans.

80.     When a residence is poorly maintained, like the residences subleased by Balfour to the Plaintiffs, the residence is virtually certain to be damp and therefore more likely to be contaminated by poisonous mycotoxin-producing mold.

81.     Poisonous mycotoxin-producing mold contaminates damp indoor areas by introducing into the air and on surfaces colonized and sporulating poisonous mold that is feeding on or searching for virtually any organic substance on which to feed and to recolonize.

82.     When the food source on which colonized mold is feeding becomes inadequate to feed the colony, the colony produces spores, unable to be seen by the naked eye, which float through the air searching for food on which to feed to remain vitalized, form another mold colony, and avoid dormancy.

83.     The inside of the human body presents an optimum food source for poisonous mycotoxin-producing mold.

84.     Mycotoxin-producing mold easily gains entrance inside a human body by transdermal penetration, inadvertent ingestion, and inadvertent inhalation.

85.     Mycotoxins separate from the mold inside the human body and, among other things, destroy human cells.

86.     Mycotoxins poison cells, interfere with organic proteins, interrupt DNA functioning, and in other ways systemically interfere with vital bodily functions in susceptible humans.

87.     Only humans with a sufficiently vibrant immune system, able to repel the poison introduced inside a human body by mycotoxin-producing mold, can avoid bodily injury and/or disease by poisoning from mycotoxin-producing mold.

88.     The residences subleased by Balfour to the named Plaintiffs and other military members at Fort Eisenhower were contaminated by poisonous mycotoxin-producing molds, which were the proximate actual cause of injury and/or disease in the Plaintiffs.

89.     The damp indoor conditions in the residences subleased by Balfour could have been effectively remediated by Balfour and, by effective remediation, rendered the indoor spaces safe.

90.      Rather, Balfour made a conscious choice to do nothing and allow the residences to remain contaminated by poisonous mycotoxin-producing mold and other environmental conditions for the duration of the time the Plaintiffs inhabited the residences.

**E.     Balfour Fails to Learn its Lesson and Continues its Abuse of Military Members**

91.     Since December 22, 2021, BBC and its subsidiaries and affiliates have been and remain under the terms of the Plea Agreement, holding BBC to strict standards of conduct in

dealing with military members living in facilities owned and operated by BBC and Balfour Affiliates.

92.     Nevertheless, upon information and belief, just months after BBC's December 22, 2021 plea of guilty to major fraud and becoming bound by the Plea Agreement, rather than correct its mistakes and live up to its contractual obligations, BBC and the Balfour Affiliates began forcing residents, including those residing at Fort Eisenhower, who complained about their living conditions to sign non-disclosure agreements ("NDAs") as a condition to receiving compensation for their substandard housing or as a condition to receiving alternative housing.

93.     Through payments and NDAs, Balfour sought to cover up its continuing fraud and unfair business practices by which Balfour victimized military members and their families.

94.     Military members are exceptionally vulnerable to coercion, intimidation, and duress because of their dedication to service and because of their fear, founded or unfounded, that seeking a remedy through official channels will have a detrimental retaliatory effect on their military career or their ability to get housing for their families.

95.     Balfour appeared, in April 2022, before the United States Senate Permanent Subcommittee on Investigations to testify about the major fraud and the acts and omissions leading to the Plea Agreement ("2022 Senate Hearing"). This hearing and the associated investigation formed the basis for the aforementioned 2022 Senate Report.

96.     At the 2022 Senate Hearing, BBC appeared and gave sworn testimony, again, through Richard Taylor, President for Facility Operations, Renovations, and Construction.

97.     Through Mr. Taylor's testimony, BBC assured the Senate Committee that BBC had taken measures to prevent the recurrence of the acts and omissions which were related to the fraud to which BBC pled guilty four months earlier.

98.     On April 18, 2023, United States Senator Jon Ossoff ("<u>Senator Ossoff</u>") published the Georgia Military Housing Oversight Report[13] (the "<u>Georgia Report</u>") with the findings of a follow up investigation to determine if Balfour's performance had improved in the ensuing year since the 2022 Senate Hearing and 2022 Senate Report.

99.     The Georgia Report contained reports of continuing abuses of military family members similar to the acts and omissions which precipitated the major fraud charge to which BBC pled guilty one year and four months earlier.

100.    Time and again, both in the Plea Agreement and since, Balfour has been shown leniency dependent on Balfour's promises to reform; yet Balfour has continuously persisted with its relentless pursuit of undeserved and unearned profits by depriving military members and their families of contractually obligated housing and services.

**<u>THE PORRAS FAMILY</u>**

101.    The Porras Family relocated to Fort Eisenhower after receiving permanent change of station orders ("PCS") in the summer of 2021.

102.    The Porras Family applied for housing on-base with Balfour and were offered a unit known as 1845-D Hill Drive Fort Gordon, Georgia (the "<u>Balfour House</u>").

103.    The Porras Family inspected the home and found that it had not been cleaned, the carpets were filthy, and there were dead insects throughout the Balfour House.

104.    SFC Porras and Mrs. Porras asked if the carpets could be replaced prior to them moving in; however, Balfour representatives told them that they could request a modification for this, and the Porras Family did so.

---

[13] Hon. John Ossoff, <u>Georgia Military Housing Oversight Report</u>, (2023) (available at: <u>https://www.ossoff.senate.gov/wp-content/uploads/2023/04/2023-Ossoff-Georgia-Military-Housing-Oversight-Report.pdf</u>).

105.     The request was approved, but it would take over a month before a contractor could come start the process. Unable to afford temporary lodging in the meantime, which would have been at their expense, the Porras Family had no choice but to take possession of the filthy Balfour House.

106.     On June 12, 2021, SFC Porras signed the lease for the Balfour House.

107.     On the same day, SFC Porras was presented with a mold addendum, which required SFC Porras to report to the community manager any evidence of water leaks or excessive moisture; any evidence of mold or mildew-like growth that could not be removed by applying a household cleaner; any failure or malfunction of the ventilation or air conditioning system; and any inoperable windows and doors.

108.     Although Balfour was required to repair the Balfour House pursuant to the lease, the mold addendum made clear that Balfour was also specifically obligated to remediate mold issues in the Balfour House.

109.     Within days of moving into the Balfour House, the hot water heater in the Balfour House failed, leaving the Porras Family without hot water.

110.     Defects with hot water were known to Balfour as far back as 2016 based on maintenance records in the Balfour House's seven-year maintenance history ("Maintenance History").

111.     Within a short period of living in the Balfour House, the Porras Family discovered problems related to un-remediated leaks in the roof and ceilings.

112.     Defects with the roof and ceilings dated back to 2018 in the Maintenance History.

113.     The Porras Family immediately reported these leaks to Balfour as required in both the lease and the mold addendum to the lease.

114.     Through its mold addendum, Balfour assured the Porras Family that Balfour was aware of the importance of immediately and fully addressing moisture issues, and the Porras Family expected Balfour would quickly repair the defects causing the leaks in the roof and ceilings in the Balfour House.

115.     Balfour did not repair the defects causing the leaks in the roof and ceilings.

116.     Balfour listed the repair request as pending in their maintenance system and reported in the maintenance system that a tarp was placed on the Balfour House's roof until a contractor could repair the roof.

117.     The tarp would have been a temporary and inadequate solution at best; however, in reality Balfour did not tarp the roof of the Balfour House for several months. In the meantime, Balfour had the gall to tell the Porras Family to use buckets under the continually leaking ceiling so that it did not damage the newly installed carpet.

118.     After months of ignoring the persistently pleas of the Porras Family to repair the leaks in the roof and ceilings in the Balfour House, Balfour promised the Porras Family that Balfour's maintenance personnel would come to the Balfour House to repair the Balfour House's roof.

119.     Despite Balfour's purported repair of the Balfour House's roof, continuing leaks in the roof and ceilings in the Balfour House made it evident that no repair of the defect occurred.

120.    The following image shows leaking in the Balfour House in A.P.'s bedroom:



121.    The following image shows leaking in another of the Balfour House's bedroom:



122.    The following images shows visible moisture damage to other walls inside the

Balfour House:





123.     Whether solely because of the roof leaks in the Balfour House and moisture in the Balfour House or because of defects in the Balfour House's HVAC system, the Porras Family witnessed black mold in and around air conditioning vents in the ceiling, consistent with systemic defects in Balfour on-base housing at Fort Eisenhower.

124.    This mold also spread to the ceilings of the Balfour House, as depicted below:



125.    Additionally, the Porras family experienced defects in the Balfour House related to water intrusion at the Balfour House's back door and underneath the floor, primarily due to the fact that the back door to the Balfour House was rotten.

126.    The Porras family also experienced ongoing defects such as unremedied clogged and leaking sinks, showers, and toilets throughout the Balfour House.

127.    The Porras family reported all these ongoing defects in the Balfour House to Balfour.

128.    Though the Porras Family repeatedly reported to Balfour all the ongoing water leakage problems in the Balfour House, Balfour failed to address the defects.

129.    Because of Balfour's refusal to repair the ongoing water leakages in the Balfour House, toxic mold grew in air conditioning ducts in the Balfour House and in spaces under the Balfour House's cabinetry.

130.    The below picture depicts the interior of an air conditioning duct in the Balfour House:



131.    The below pictures depict growing toxic mold under the Balfour House's cabinetry caused by the unrepaired and ongoing water leakages in the Balfour House:





132.   The below picture depicts growing toxic mold under the Balfour House's floor caused by the unrepaired and ongoing water leakages in the Balfour House:



133.   The leaks inside the Balfour House and water intrusion issues were well known to Balfour prior to Balfour leasing the Balfour House to the Porras Family and were documented problems in the Maintenance History.

134.   Shortly after moving into the Balfour  House, Mrs. Porras observed that the wall in one of the upstairs bathrooms in the Balfour House, adjacent to the shower, was bulging and was consistently damp.

135.   When Mrs. Porras told Balfour personnel about the problem with the bathroom wall, the Balfour personnel stated that the bulging wall and consistent dampness was a bad patch job and not to worry about it.

136.    The picture below depicts the area in question described in the foregoing paragraphs:



137.    The Porras Family experienced ongoing problems with growth of black mold and persistent moisture in the Balfour House's bathroom.

138.    Mrs. Porras submitted multiple work orders to repair the wall in the bathroom and address the ongoing growth of black mold.

139.    In response to the work order, Balfour installed a splash guard and told Mrs. Porras they had repaired the defect; however, they did not do any additional repairs to the damp wall.

140.    Despite the purported repair of the wall with a splash guard, the same issues persisted with the wall being damp and there being growth of black mold.

141.     Mrs. Porras again reported the dampness and black mold to Balfour.

142.    This time Balfour personnel came and assessed the situation and stated that "weep holes" in the shower had been caulked closed and needed to be opened.

143.    Balfour personnel supposedly opened the "weep holes installed a larger splash guard, re-mudded the wall, and left a dehumidifier in the bathroom for a week to repair the issues with the moisture and black mold.

144.    Upon information and belief, at no point did Balfour personnel open the wall, remove the wet sheetrock, or take any steps to uncover the cause of the moisture.

145.    None of Balfour's supposed repairs in the Balfour House's bathroom actually repaired the persistent moisture and black mold problems in the bathroom.

146.    On August 30, 2022, nearly a year after moving into the Balfour House and with the persistent moisture and black mold growth unabated, Mrs. Porras persuaded Balfour personnel to cut into the bathroom wall to determine the cause of the moisture.

147.    After cutting the bathroom wall open, Balfour personnel left the wall open with a dehumidifier in the bathroom.

148.    On the morning of August 31, 2022, Mrs. Porras looked into the hole cut in the bathroom wall by Balfour personnel and observed a green and black growth on the interior of the sheetrock bathroom wall.

149.    Mrs. Porras immediately contacted SFC Porras, who was out of town for work, and asked him to have a representative from his command come observe the green and black growth inside the bathroom wall.

150.    When these representatives from SFC Porras' command came to the Balfour House later that day on August 31, 2022, they were accompanied by a Balfour contract "environmentalist."

151.    The environmentalist denied that the green and black growth was mold and said that it was "definitely something but not mold."

152.    However, Balfour personnel still covered the hole that night.

153.    The next day Balfour personnel returned to repair the wall, and despite the substance being "not mold" wore protective equipment while they cut more sheetrock out of the wall.

154.    Mrs. Porras again inspected the hole and was horrified to see more of the supposed "not mold" growing inside the wall.

155.    The following picture depicts the interior of the wall in the bathroom that Mrs. Porras observed:



156. Mrs. Porras also observed pieces of the drywall with the black and green mold on it, which the Balfour workers had left on the floor of the bathroom.

157. Mrs. Porras put these pieces of drywall in a bag to keep as proof of what was in the wall of the Balfour House.

158. Pictures of the pieces of drywall are below:





159.     The following day, when the Balfour personnel returned to the Balfour House, Mrs. Porras confronted them with this virtually irrefutable proof that there was mold in the walls of the Balfour House.

160.     Balfour recalled the "environmentalist" to the Balfour House and, faced with the fact that Mrs. Porras now had in her possession actual pieces of the wall with mold on them, this time he conceded that there was mold inside the wall.

161.     However, rather than perform a detailed inspection of the house, the Balfour workers simply cut away a little more drywall, swept up the pieces, re-mudded the wall, and left the dehumidifier in the bathroom.

162.     The Balfour workers returned the next day and painted the spot they had painted, clearly hoping the Porras family would drop the issue and the next tenant would be none the wiser.

163.     Concerned with how Balfour had treated this clear issue of mold contamination in the Balfour House, as well as the numerous other defects and sham "repairs" they experienced during their time at the Balfour House, the Porras family hired Josh Rachal of Texas Mold Inspectors to inspect the Balfour House.

164.     Mr. Rachal performed his inspection on September 28, 2022 ("Rachal Inspection") and informed the Porras Family that he believed the Balfour House posed a serious threat to their health.

165.     This warning was confirmed by a 140-page report Josh Rachal issued subsequently, detailing the extensive presence of toxic mold in the Balfour House.

166.     For the sake of their health, the Porras family left the Balfour House on September 28, 2022, disrupting their entire life, and moved into a hotel.

167.    The Porras Family informed Balfour of the results of the Rachal Inspection and subsequently moved into a hotel for a month and an AirBnB rental another month while searching for new housing in the Augusta area.

168.    After the Porras Family informed Balfour of the results of the Rachal Inspection, the Porras Family met with Balfour personnel along with Mark Hartz ("Hartz") of Alternative Construction & Environmental Solutions, Inc.

169.    Hartz is frequently engaged by Balfour at Fort Eisenhower, to act as a "third-party" inspector for suspected mold cases.

170.    However, Hartz's real purpose appears to be to add an air of legitimacy to Balfour's denials that the mold-ridden houses at Fort Eisenhower pose any issue to the military members living there.

171.    Hartz conducted a cursory inspection of the Balfour House.

172.    Throughout the inspection of the house, he talked down to the Porras Family and gaslit them regarding their concerns about mold in the Balfour House.

173.    Despite the fact that there were active mold colonies throughout the Balfour House, which were documented with photographs and confirmed through lab testing by the Rachal Inspection, Hartz tried to discount the significance of these findings saying the following or words to the effect of:

> You tell me you want me to find mold. I can find mold because it's here. It's all around us and everything like that. The things that we're looking for is things that are causation. That's what we're looking for.

> Shower, toilet leak? What would, you know, you've gotta [*sic*] have, you have to have moisture. You have to have a food source. Then you have to have the proper temperature for different types of variables of mold. Right. If you don't have those three, you don't have mold. Okay. But every time we open that door, every time we walk across this lawn, every time we're bringing things in, there's things that can be brought in. So you gotta [*sic*] separate out from that. I see that you have tests. Did

they compare the inside to the outside? Did he take any samples outside? What you gonna [*sic*] compare it to? Like I said, if I move in there right now or you have strawberries and you throw strawberries away, I'm gonna [*sic*] have excessively high levels of Penicillium Aspergillus. Okay. Leaves are starting to fall. I'm gonna [*sic*] have Cladosporium - because as I walk across this ground Cladosporium is on those leaves, I'm gonna [*sic*] track that inside the house.

So what's stopping me from taking a sample in there and telling you that your house is infected by Cladosporium or Penicillium Aspergillus? When I tracked it in personally as the, as the person doing the tests doing it. That's the, that's just general, general examples.

174.   Hartz further attempted to discredit the Rachal Inspection and the confirmed results of mold contamination by saying the following or words to the effect of:

Now remember I said earlier about did they take an outdoor sample? Right. Because all the stuff that you read in every one of the regulated states that I have to be licensed in to do work, I have to come up with a way to differentiate between indoor versus outdoor. The indoor environment has to be cleaner than the outdoor environment. Right. Right, right. And that's after typically remediation and those kind of things. You don't typically do it on an investigation unless you see active growth and, and those kind of things. And then you remove the active growth, you go to the EPA epa.gov/mold. The 402 K document is what you wanna [*sic*] read. And it clearly says in there, if you see discoloration, visible mold, remove it. Don't test. It clearly says that right there "do not test." And so we have these people that go out and that's the first thing they wanna [*sic*] do, is they wanna [*sic*] test. Well they don't, they're not following the federal guidance and or anything like that.

175.   This was false in that EPA Publication 402-K-02-003 never states that someone should not test an active mold growth. Rather, it merely observes – logically – that if there is visible mold growth it may not be necessary to test it, because the mold growth is visible.

176.   Hartz also attempted to gaslight them into believing that the documented and lab-confirmed mold colonies were not mold, saying the following or words to the effect of:

I'm gonna [*sic*] take the devil's advocate side of this, and hopefully it'll make you feel a little better too. When you have air conditioning on in the south, we're gonna [*sic*] have condensation. Correct. Obvious everything's going to condensate. What is the dew point material? The dew point material is gonna [*sic*] be the metal grates in the HVAC ducts. Okay? So, when that cold air hits that metal grate, it's gonna [*sic*] get it really, really nice cold. Right? It's gonna [*sic*] be about 55 degrees coming out that vent. Even if you, so if you haven't set, you know, 68, 70, it's usually

10/15 degrees cooler coming directly out. Well, inside, we're at 75 degrees at that vent, we're at 55 degrees.

So, our dew point's gonna [*sic*] be where those two meet in the middle. And, at that point, you can have condensation. And, when you have condensation, you may not see it, but the condensation is there. You've, you've seen metal where you've touched it with your finger, and all of a sudden you can see the trailing from your finger. Right? You didn't see any on there until you touched it. And, then, you realize it's there. Dust as dust floats through the air at five microns in size. Typically, it will sit and it'll attach to that moisture. When it attaches to that moisture, it dries, cause as your air conditioning cycles off, it'll just evaporate. And, what you're gonna [*sic*] see, it looks like fuzzy growth. And, I have a lot of people, when I do this all over the country, they say, I got fuzzy growth. I got fuzzy growth. And, you go up, and it's actually not. It's dirt. And, we've done tests. We've used peroxide. You know? To activate the microbial, everything. And, it's dirt.

You know, it's, but uh, but no, that's, that's what they're looking at. I have the same thing in the south with, uh, floor joists when they get in the crawlspace. Crawlspace. Uninhabited! Right? But what happens is the southern pine has what's called blue sap. It's blue sap that seeps out of the pine on those boards, and you're in the crawl space. So, we get dust blown across here. It gets into the crawlspace. It gets on that blue sap and that dust, then, looks like it's growing up because it turns and, and goes vertical. And, so, when people look at that, they say, oh, I've got mold in my crawlspace. Well, first thing I say is. You live in your crawlspace? No. Well, then, don't worry about it. Does it ventilate? Yeah. Okay. You're good to go. It should be the same in your crawlspace as what it is right here, where we're standing. The blue sap, that is, sticky catches all that dirt. And, so, again, people look at that and say, oh my God, I've got growth where it's not.

177.    Ultimately, based on Hartz's fraudulent inspection and report, Balfour concluded that there was nothing wrong with the Balfour House and has presumably rented it to another unsuspecting military family.

178.    Prior to moving into the Balfour House, the Porras Family were all in good health.

179.    Shortly after moving into the Balfour House, Ashley Porras developed difficulty with breathing, experienced tightness in her chest, suffered constant irritation in her throat and eyes, and suffered from headaches and fatigue.

180.    These conditions caused her to have multiple trips to the emergency room and urgent care to get relief, and she was also prescribed an albuterol inhaler.

181.     All the Porras children were healthy prior to moving into the Balfour House, and likewise later experienced numerous health problems shortly after moving into the Balfour House.

182.     During his time in the Balfour House, K.P. had frequent nose bleeds, fatigue, headaches, and severe unexplained stomach and back pain.

183.     K.P.'s stomach and back pain prevented him from being able to participate competitively in gymnastics, despite being invited to do so due to his natural aptitude.

184.     Their daughter A.P. also experienced nose bleeds, headaches, and had a persistent cough.

185.     E.R. and D.P suffered from chronic coughs and sinus issues, as well as fatigue while living in the Balfour House.

186.     SFC Porras developed chronic migraine headaches while living in the Balfour House, an issue for which he had no prior medical history.

187.     These migraine headaches were particularly difficult for SFC Porras because at the time he served in a highly demanding position as a drill instructor.

188.     SFC Porras's service as a drill instructor required him to spend long hours at work and away from his family only to return home and spend most of his time managing these new symptoms and not enjoying his limited time with his family.

189.     Since moving out of the Balfour House, some of the symptoms the Porras Family experienced have improved, but they still suffer from some of the ill-effects of living in the Balfour House.

190.     The Porras Family paid in excess of $25,000.00 to Balfour during their time in the Balfour House through allotments from SFC Porras's paycheck, but did not receive the safe and habitable housing that Balfour represented to them they would.

191.    After vacating the Balfour House, the Porras Family also had to dispose of many of their personal belongings because of fear of contamination from the environmental hazards in the Balfour House.

192.    This property included special toys belonging to their young children.

193.    Uprooting their children to live in a series of temporary housing arrangements, throwing away their children's toys, all while dealing with their persistent health problems was extremely traumatic for the entire Porras Family.

194.    Additionally, because the Porras Family was misled about the condition of the Balfour House, they did not pursue other housing options when they relocated to Fort Eisenhower.

195.    In July of 2021 when the Porras Family moved to Fort Eisenhower, the 30-year mortgage rate averaged around 3.365%.

196.    By the time the Porras Family was forced to move out of the Balfour House because of the danger to their family and after being told they would not be offered another house at Fort Eisenhower, the 30-year mortgage rate averaged around 7.27%.

197.    Further, due to the skyrocketing cost of rent, a lease for a house to comfortably accommodate the Porras Family of six was untenable.

198.    The Porras Family had to purchase a house with a substantially higher mortgage payment than would have been available to them just a year prior, had they realized that the housing at Fort Eisenhower was not safe and purchased an off-base house from the start.

199.    This higher mortgage, combined with having to pay out of pocket for temporary living arrangements and replace their personal possessions has all but wiped out the Porras Family's savings.

200.     Additionally, because of a cooling real estate market and the cost of their current mortgage, SFC Porras recently had to forgo a career-enhancing job in Texas in order to stay at Fort Eisenhower and avoid selling the Porras Family's current house, which would cause the Porras Family financial ruin.

201.     Because he was not able to take this career-enhancing job, SFC is unlikely to get promoted for at least a year longer than he would have otherwise.

202.     This delay in his promotion is likely to cost him tens of thousands of dollars over the course of his career.

203.     Further, because of the high mortgage and other costs associated with having to uproot their lives, the Porras Family can no longer afford extracurricular activities for their children.

204.     Nearly every aspect of the Porras Family's life – their health, career, finances, and mental well-being—has been adversely affected by their time in the Balfour House.

205.     The Porras Family still fears that they may never fully recover from their experience living in the Balfour House.

## CAUSES OF ACTION

### COUNT I –Negligence
### (by all Plaintiffs against All Defendants)

206.     Plaintiffs incorporate by reference paragraphs 1 through 205 as if fully stated herein.

207.     Balfour, as professional landlord specializing in the business of privatized military housing, owed Plaintiffs a duty to provide them with habitable living conditions in the Balfour House, including a duty to timely maintain, repair, or replace parts of the Balfour House which

were defective or had fallen into disrepair and to maintain the house at the standard advertised and otherwise represented by Balfour to the Plaintiffs.

208.    Balfour also has and had a statutory duty as a landlord to "keep the premises" – to wit the Balfour House - "in repair" under Georgia state law per O.C.G.A. § 44-7-13.

209.    Balfour's acts and omissions, as detailed in this Complaint, in performance of Balfour's duties as the Plaintiffs' landlord is and has been below the applicable standard of care owed to the Plaintiffs as mandated by Georgia law.

210.    Balfour has breached Balfour's duty to the Plaintiffs by failing to maintain the leased residences to ensure the leased residence are safe and fit for human habitation, failing to properly repair and remedy those conditions affecting the health and safety of the Plaintiffs even after being informed of and observing first-hand the degraded and unsafe conditions of the homes under Balfour's care, failing to send qualified repair persons to perform the necessary repairs and remediation, and falsely stating that repairs had been completed when the problems persisted.

211.    Balfour deliberately refused to employ repairpersons with skills and experience that qualified them to perform the necessary repairs and remediation required to make repairs and otherwise maintain the Balfour House to a minimum standard required to meet Balfour's duty of care Balfour owed to the Plaintiffs as their landlord.

212.    To cover-up the repeated deliberate breaches of the reasonable duty of care Balfour owed to the Plaintiffs, Balfour, as standard operating procedure, intentionally made knowingly false statements to the Plaintiffs that adequate repairs to the Balfour House had been effectuated, knowing, in truth and fact, adequate repairs to the Balfour House had not occurred, and the defects persisted.

213.    As a legal and proximate result of Balfour's conduct, Plaintiffs have been injured and have suffered damages.

214.    As a legal and proximate result of Balfour's conduct, Plaintiffs have experienced unnecessary duress, distress, mental anguish, and physical and emotional pain and suffering, and Plaintiffs have been deprived of the use and quiet enjoyment of the Balfour House and suffered annoyance.

215.    Plaintiffs are entitled to recover damages against Balfour in an amount in excess of $1,000,000.00, an exact amount to be proven at trial.

## COUNT II – Gross Negligence
### (by all Plaintiffs against all Defendants)

216.    Plaintiffs incorporate by reference paragraphs 1 through 205 as if fully stated herein.

217.    Balfour, as landlords specializing in the business of privatized military housing, owed Plaintiffs a duty to provide them with habitable living conditions in the Balfour House, and to maintain and repair them to a standard fit for human habitation.

218.    Balfour also has and had a statutory duty as a landlord to "keep the premises" – to wit the Balfour House – "in repair" under Georgia state law per O.C.G.A. § 44-7-13.

219.    Balfour's conduct is and has been grossly below the applicable standard of care, was recklessly indifferent to the consequences of Balfour's actions, and failed to demonstrate the level of slight diligence that an inattentive person would have exercised under the same or similar circumstances.

220.    Balfour has breached its duty to the Plaintiffs by failing to maintain the leased residences to ensure the leased residence are safe and fit for human habitation, failing to properly repair and remedy those conditions affecting the health and safety of the Plaintiffs even after being

informed of and observing first-hand the degraded and unsafe conditions of the homes under Balfour's care, failing to send qualified repair persons to perform the necessary repairs and remediation, and falsely stating that repairs had been completed when the problems persisted.

221.    Balfour has been grossly negligent in operating and maintaining the Balfour House in which Plaintiff lived at Fort Eisenhower.

222.    As a legal and proximate result of Balfour's conduct, Plaintiffs have been injured and have suffered damages.

223.    As a legal and proximate result of Balfour's conduct, Plaintiffs have experienced unnecessary duress, distress, mental anguish, and physical and emotional pain and suffering, and Plaintiffs have been deprived of the use and quiet enjoyment of the Balfour House and suffered annoyance.

224.    Plaintiffs are entitled to recover damages against Balfour in an amount in excess of $1,000,000.00, an exact amount to be proven at trial.

### COUNT III – Breach of Contract
### (by all Plaintiffs against all Defendants)

225.    Plaintiffs incorporate by reference paragraphs 1 through 205 as if fully stated herein.

226.    Balfour owed a contractual obligation to Plaintiffs to provide habitable housing and to remedy water leaks, mold, and other issues with the Balfour House.

227.    Balfour's contractual obligations arise by virtue of the Lease BBC had with Plaintiffs and because Plaintiffs and tenants other than Plaintiffs to whom Balfour is and has been a professional landlord specializing in the business of privatized military housing, are third-party beneficiaries of the Master Lease between the United States and BBC, as well as contracts between the United States and Balfour more generally for property management, repairs, and development.

228.     Balfour has breached their contractual obligations to Plaintiffs evidenced in the Lease between Balfour and SFC Porras, by which Balfour leased the Balfour House to SFC Porras.

229.     As a proximate result of Balfour's breaches described in the immediately preceding three paragraphs, Plaintiffs have suffered property damages and personal injuries more particularly stated in this Complaint.

### COUNT IV - Breach of Implied Warranty of Habitability
### (by all Plaintiffs against all Defendants)

230.     Plaintiffs incorporate by reference paragraphs 1 through 205 as if fully stated herein.

231.     Balfour, as landlords specializing in the business of privatized military housing, owed Plaintiffs a duty to provide them with habitable living conditions in the Balfour House, and to maintain and repair them to a standard fit for human habitation.

232.     Through the lease between BBC and Plaintiffs, Balfour warranted that the Balfour House was safe, habitable, and free from latent defects.

233.     Balfour had knowledge of latent defects based on the lengthy history of maintenance problems at the Balfour House.

234.     Balfour willfully and knowingly concealed these latent defects from Plaintiffs by falsely claiming that all issues in the maintenance history had been resolved, when Balfour knew they had not.

235.     Even after being informed of problems at the Balfour House, Balfour refused to acknowledge that there were any issues.

236.     As a legal and proximate result of Balfour's breach of the implied warranty of habitability, Plaintiffs have suffered mental, physical, and emotional damages and loss of property.

237.    Plaintiffs are entitled to recover damages for Defendants' breach of the implied warranty of habitability.

### COUNT V – Constructive Eviction
### (by all Plaintiffs against Defendants)

238.    Plaintiffs incorporate by reference paragraphs 1 through 205 as if fully stated herein.

239.    Balfour's acts and omissions, including particularly, among other acts and omissions, refusing and failing to acknowledge, identify, reasonably respond to, and repair/remediate the defects and disrepairs described in this Complaint caused serious and substantial interference with Plaintiffs' enjoyment of the Balfour House.

240.    Balfour intentionally and willfully failed to remediate and repair defects and disrepairs in the Balfour House, known by Balfour to be dangerous to the Plaintiffs' health and safety, which Balfour knew Balfour had a duty to remediate and repair pursuant to the contracts and other duties described in this Complaint.

241.    Balfour's acts and omissions permanently deprived Plaintiffs of their beneficial use and enjoyment of the Balfour House.

242.    Balfour's acts and omissions subjected Plaintiffs to prolonged exposure to toxic and/or unlivable conditions within the Balfour House which seriously impacted Plaintiffs' personal physical and mental health.

243.    Plaintiffs repeatedly notified Balfour of the above defects and dangerous conditions present in the Subleased at the Balfour House and Balfour repeatedly failed or refused to remedy them.

244.    Balfour's repeated refusals to fulfill its contractual obligations to eliminate the defects and disrepairs, which at that time and continuing thereafter seriously endangered the

ongoing physical and mental health of the Plaintiffs, created a duress that forced the Plaintiffs to vacate the Balfour House for their health and safety.

245.    Plaintiffs would not have vacated the Balfour House but for Balfour's refusals to fulfill its promises to repair and eliminate dangerous conditions at the Balfour House.

246.    Balfour's conduct constituted a constructive eviction of the Plaintiffs that has caused Plaintiffs to suffer damages including but not limited to personal injuries, monetary loss, and property loss.

### COUNT VI – Violation of § 3951(a) of the Servicemembers Civil Relief Act (by all Plaintiffs against Balfour)

247.    Plaintiffs incorporate by reference paragraphs 1 through 205 and paragraphs 238 through 246 as if fully stated herein.

248.    The purpose of the Servicemembers Civil Relief Act ("SCRA") is "to provide for, strengthen, and expedite the national defense through protection extended by this chapter to servicemembers of the United States to enable such persons to devote their entire energy to the defense needs of the Nation." 50 U.S.C. § 3902(1).

249.    SCRA Section 301 (50 U.S.C. § 3951) prohibits a landlord from evicting an active duty servicemember or their dependents from a residence without a court order.

250.    As described in Paragraphs 238 to 246, Balfour evicted Plaintiffs, without a court order, in violation of the SCRA.

251.    Plaintiffs sustained damages, including but not limited to personal injuries and property loss, caused by Balfour's violation of the SCRA.

252.    Plaintiffs are also entitled to reasonable attorneys' fees and costs incurred to remedy Balfour's violation of the SCRA.

### COUNT VII – Unjust Enrichment

**(by all Plaintiffs against all Defendants)**

253. Plaintiffs incorporate by reference paragraphs 1 through 205 as if fully stated by herein.

254. In accordance with the terms of their lease, Plaintiffs paid Balfour their BAH in exchange for a safe and habitable place to live.

255. The Balfour House that Balfour provided to Plaintiffs was neither safe nor habitable.

256. By paying over or causing to be paid over to Balfour their BAH, Balfour obtained a benefit from Plaintiffs but failed to deliver the promised safe and habitable place for Plaintiffs to live in exchange for the payment.

257. Because Balfour failed to deliver a safe and habitable place to live, it is unjust for Balfour to retain the BAH.

258. Plaintiffs are entitled to recover the BAH paid to Balfour plus consequential damages.

**COUNT VIII – Fraud**
**(by all Plaintiffs against all Defendants)**

259. Plaintiffs incorporate by reference paragraphs 1 through 205 as if fully stated herein.

260. Balfour deliberately and willfully made false statements and material omissions about the condition of the Balfour House, as described above.

261. Balfour also made false statements about the status and success of their repair and remediation work at the Balfour House, as described above.

262.    Balfour was aware that the false statements and omissions would be material to Plaintiffs because these false statements and omissions concerned the suitability of housing for basic human habitation.

263.    Balfour also knew these statements were false because at the time Balfour made them, Balfour had actual knowledge of the ongoing issues with the Balfour House due to the seven-year maintenance report and repeated reports made by Plaintiffs of mold in the Balfour House.

264.    Plaintiffs reasonably relied on Balfour's statements both in entering into the lease and in remaining in the Balfour House and paying their BAH to Balfour.

265.    But for Balfour's false statements and omissions, Plaintiffs would not have agreed to move in or remain in the Balfour House.

266.    Plaintiffs have been injured and have suffered damages, including but not limited to personal injuries and property loss, as a proximate result of Balfour's fraudulent conduct.

### COUNT IX – Georgia Fair Business Practices Act
### (by all Plaintiffs against all Defendants)

267.    Plaintiffs incorporate by reference paragraphs 1 through 205 as if fully stated herein.

268.    As detailed herein, Balfour has violated the Georgia Fair Business Practices Act ("FBPA") O.C.G.A. § 10-1-390, *et seq.*

269.    Balfour is engaged in the business of providing housing to military families at Fort Eisenhower and other military installations through the MHPI.

270.    Plaintiffs are consumers within the meaning of O.C.G.A. § 10-1-392(a)(6).

271.    Pursuant to its Master Lease with the Department of the Army and through lease agreements with military members, including Plaintiffs, Balfour leases real property in the state of Georgia to military members and their families.

272.    Balfour represents, through its public statements and through statements directly to military members, that it provides high quality, well-maintained, and safe housing in exchange for the military members' BAH.

273.    Balfour represents that it will provide the military members with all necessary maintenance and that it will provide excellent customer service in the event of any problems with the housing.

274.    Balfour makes these representations in Paragraphs 271 and 272 to induce military members and the families to lease Balfour House from Balfour and not to seek housing off base.

275.    Despite these representations, Balfour intentionally does not maintain its properties in a safe and habitable manner; provides bare minimum responses to service calls; and generally neglects its military tenants all while continuing to take the military members' BAH.

276.    In the course of leasing the Balfour House to Plaintiffs, Balfour violated the FBPA by (i) breaching the implied warranty of habitability; (ii) engaging in an unconscionable course of action; and (iii) using false, misleading, and deceptive practices, including:

a.  Causing actual confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

b.  Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that they do not have;

c.  Representing that goods or services are of a particular standard, quality, or grade or that goods are of a particular style or model, when they are another; and

d.  Disparaging goods, services, or business of another by false or misleading representations; and

e.   Advertising goods or services with intent not to sell them as advertised.

277.   Specifically, Balfour, by virtue of its course of administering, leasing, building, and repairing real property at Fort Eisenhower, was uniquely aware of the condition of the Balfour House, including the existence of mold and numerous maintenance issues with the real property they manage. Nevertheless, Balfour knowingly and intentional leased the Balfour House to the Plaintiffs, necessarily and as a matter of act, representing to Plaintiffs that that the Balfour House was habitable, that appropriate repair and remedy work and been undertaken in the past, and that appropriate repair and remedy would take place in the future.

278.   Balfour's knowing and intentional misrepresentations were materially false, misleading, and were made to induce Plaintiffs into entering a lease with Balfour. Plaintiffs relied on these false representations when entering into the lease for the Balfour House and have suffered serious economic, mental, physical, and emotional injuries as a result. Had Plaintiffs known the true condition of the Balfour House and been given an adequate opportunity to inspect it, they would not have entered into the lease.

279.   Balfour's actions and misrepresentations herein were intentional and were done with actual awareness of the falsity, deception, or unfairness of the acts or practices.

280.   Plaintiffs are entitled to recover for all damages arising from Balfour's conduct including actual damages; past, present, and future economic damages; mental anguish damages; treble damages; and attorney's fees, all as provided for in the FBPA.

### COUNT X – Punitive Damages
### (by all Plaintiffs against all Defendants)

281.   Plaintiffs incorporate by reference paragraphs 1 through 205; 207 through 215; 217 through 224; and 260 through 266 as if fully stated herein.

282.     By clear and convincing evidence, Balfour has acted, throughout its course of dealing with Plaintiffs, with willful misconduct, malic, fraud, wantonness, oppression, and with that entire want of care that would raise the presumption of conscious indifference to the consequences of their actions.

283.     Plaintiffs are entitled to an award of punitive damages to punish, penalize, and deter Balfour from such future misconduct.

**COUNT XI – Attorney's Fees**
**(by all Plaintiffs against all Defendants)**

284.     Plaintiffs incorporate by reference paragraphs 1 through 205; 207 through 215; 217 through 224; 226 through 229; 231 through 237; 239 through 247; 248 through 252; 254 through 258; 260 through 266; 268 through 280; and 282 through 283 as if fully stated herein.

285.     Balfour has acted in bad faith, been stubbornly litigious, and has caused Plaintiffs unnecessary trouble and expense.

286.     Plaintiffs are entitled to an award of their attorney's fees pursuant to O.C.G.A. § 13-6-11.

**COUNT XII – Joint and Several Liability**

287.     Plaintiffs incorporate by reference paragraphs 1 through 205; 207 through 213; 215 through 222; 224 through 227; 229 through 235; 237 through 245; 247 through 251; 253 through 257; 259 through 265; 267 through 279; 281 through 282; and 284 through 285 as if fully stated herein.

288.     Defendants are jointly and severally liable to Plaintiffs on all causes of action asserted herein for a multitude of reasons.

289.     **Civil Conspiracy.** First, Defendants, acting on behalf of themselves or by or through their respective entities, parents, subsidiaries, and/or affiliates together with other unsued,

49

unnamed, or yet-unidentified co-conspirators, including but not limited to Balfour's so-called experts, consultants, and contractors (e.g. ACES and Hartz), had a meeting of the minds and embarked on a systematic attempt to defraud the Porras Family and similarly situated military families by making false representations and promises to the Porras Family and similarly situated military families in order to fraudulently induce them to lease from Balfour, without Defendants having any legitimate expectation that Defendants would provide the Porras Family and similarly situated military families with a habitable house as promised by Defendants. Defendants and other unnamed co-conspirators engaged in one or more unlawful and overt acts or omissions to execute, further, and accomplish the unlawful and otherwise wrongful acts and omissions for which the Porras Family seek relief by the instant Complaint. Therefore, Defendants themselves, and having acted through their various subdivisions, parents, affiliates, and subsidiaries, are jointly and severally liable for the culpable acts and omissions for which claims are made by the instant Complaint.

290. **Joint Enterprise.** Second, upon information and belief, Defendants are part of a joint enterprise or single business enterprise associated with the rental and maintenance of houses at military installations in Georgia and elsewhere and are not individually distinguishable. All Defendants carried on business as a mutual undertaking with a common business or pecuniary purpose and under common business control. Defendants had an express or implied agreement for a common purpose to be carried out by their enterprise and had a community of pecuniary interest. Therefore, all Defendants were engaged in a single, joint enterprise and each of them is jointly and severally liable for the claims asserted against each of them.

291. **Principal/Agent**. Third, Defendants intentionally conferred authority on one another to act on their behalf, intentionally allowed one another to believe they had authority to act

on behalf of one another, and/or by lack of care, allowed one another to believe they had authority to act on behalf of one another. As a result, all Defendants acted as the agent of the others in the course of the conduct described herein. Therefore, all Defendants are jointly and severally liable as principals/agents for the claims asserted against each of them.

292.     **Ratification**. Fourth, Defendants committed the acts complained of herein on behalf of one another and ratified the same. Each of the Defendants approved these acts by word, act, and/or conduct after acquiring full knowledge of these acts, including accepting money from Plaintiffs. This approval was given with the intention of giving validity to the acts. Therefore, all Defendants are jointly and severally liable for the claims asserted against each of them.

293.     **Aiding and Abetting**. Fifth, a person who knowingly aids and abets and/or participates in a breach of duty or fraudulent conduct is liable as a joint tortfeasor. All Defendants aided and abetted, participated in, and induced each other to make fraudulent representations and promises to Plaintiffs and to breach their duties as set forth herein. Each of the Defendants did so knowingly and benefitted from such conduct. Therefore, each Defendant is jointly and severally liable for the same.

**WHEREFORE**, Plaintiffs pray that this Court grant them judgment against Defendants, jointly and severally, on all claims and for all relief sought herein, including but not limited to:

a.   Trial by a jury of twelve on all issues so triable;

b.   Economic damages;

c.   Actual damages in the past and future;

d.   Mental anguish damages;

e.   Statutory damages;

f.   Treble damages, including treble economic and mental anguish damages under the FBPA;

g.   Punitive damages;

h.   Reasonably and necessary attorneys' fees and costs;

i.   Pre-judgment interest at the highest rate allowed by the law;

j.   Post-judgment interest at the highest rate allowed by law from the date of judgment until paid;

k.   All writs necessary to effectuate the judgment; and

l.   Such other and further relief, at law or in equity, as the Court deems to be just, proper, and equitable.

Respectfully submitted,

By: *s/Samuel J. Adams*
Samuel J. Adams
State Bar of Georgia No. 397520
sadams@fulcherlaw.com
John E. Price
State Bar of Georgia No. 142012
jprice@fulcherlaw.com

**OF COUNSEL:**
Fulcher Hagler, LLP
One Tenth Street, Suite 700
P.O. Box 1477
Augusta, GA 30901
(706) 724-0171 Telephone
(706) 396-3604 Facsimile